No. 23-2208

IN THE

# United States Court of Appeals for the Federal Circuit

FINTIV, INC.

*Appellant,*

*v.*

APPLE INC.,

*Appellee.*

On Appeal from the United States District Court for the
Western District of Texas
No. 1:21-cv-00896-ADA, Hon. Alan D Albright

## NON-CONFIDENTIAL RESPONSE BRIEF OF APPELLEE APPLE INC.

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA  92121

Jessica Hannah
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA  94105

Melanie L. Bostwick
Abigail Colella
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

Alexandra Bursak
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

*Counsel for Appellee*

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 8,843,125

**11.** A method for provisioning a contactless card applet in a mobile device comprising a mobile wallet application, the method comprising:

> activating the mobile wallet application;

> connecting to a Trusted Service Manager (TSM) system;

> synchronizing the mobile wallet application with the TSM system;

> displaying a contactless card applet based on attributes of the mobile device;

> receiving a selection of a contactless card applet;

> retrieving a widget and a wallet management applet (WMA) corresponding to the contactless card applet; and

> provisioning the selected contactless card applet, the widget, and the WMA.

**18.** A wallet management system (WMS) in a non-transitory storage medium to store and manage mobile wallet account information, comprising:

> a wallet client management component configured to store and to manage a mobile wallet application;

> a widget management component configured to store and to manage widgets;

> a device profile management component configured to store mobile device information; and

> a rule engine configured to filter a widget based on the mobile device information,

wherein said wallet management system is configured to receive the mobile device information from a mobile device and store the mobile device information in the device profile management component, and

wherein said wallet management system is configured to register the mobile device and the mobile wallet application in a Trusted Service Manager (TSM) system.

**23.** A mobile device, comprising:

a secure element (SE);

a mobile wallet application configured to store a widget corresponding to a contactless card applet, wherein the contactless card applet is stored in the SE;

a wallet management applet (WMA) corresponding to the contactless card applet, wherein the WMA is stored in the SE; and

an over-the-air (OTA) proxy configured to provision the contactless card applet, a widget corresponding to the contactless card applet, and the WMA,

wherein said OTA proxy is configured to capture mobile device information comprising SE information; and

wherein said OTA proxy is configured to transmit the mobile device information for registering the mobile wallet application.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-2208

**Short Case Caption** Fintiv, Inc. v. Apple Inc.

**Filing Party/Entity** Apple Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/25/2024

Signature: /s/ Melanie L. Bostwick

Name: Melanie L. Bostwick

iii

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Apple Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

iv

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable ☑   Additional pages attached

| See Attached | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below) ☐   No ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable ☐   Additional pages attached

| | | |
|---|---|---|
| | | |

**Attachment**

**4. Legal Representatives.** List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Orrick, Herrington & Sutcliffe LLP: Claudia Wilson Frost, Travis Jensen, Tyler S. Miller, Jeffrey T. Quilici

DLA Piper LLP: Sean C. Cunningham, Mark D. Folwer, Erin P. Gibson, John Michael Guaragna, Paul R. Steadman, Peter Maggiore, Stephanie Lim, Zachary Loney

Kelly Hart & Hallman LLP: J. Stephen Ravel, John R. Johnson

Gillam & Smith, LLP: Harry Lee Gillam, Jr.

# TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE AT ISSUE .................................................................i

CERTIFICATE OF INTEREST ............................................................. iii

TABLE OF AUTHORITIES ................................................................... ix

STATEMENT OF RELATED CASES ................................................... xii

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE ................................................................. 4

    SK C&C's CorFire Subsidiary Obtains The '125 Patent. ................. 4

    Fintiv Acquires The '125 Patent And Asserts It Against
        Apple. ................................................................................ 13

    Despite Extensive Discovery, Fintiv Repeatedly Fails To
        Articulate A Theory Of Infringement That Includes A
        Widget. ............................................................................... 16

    The District Court Grants Summary Judgment Of Non-
        Infringement Based On Fintiv's Failure To Identify A
        Widget. ............................................................................... 25

SUMMARY OF ARGUMENT ................................................................ 29

ARGUMENT ........................................................................................... 32

    I.    The Claims Require—And Fintiv Must Identify—
        "Software" That Constitutes A "Widget." ............................. 34

    II.    The District Court Properly Required Fintiv To Present
        Evidence Of Software Satisfying The "Widget"
        Limitations. ......................................................................... 44

        A.    The district court did not demand evidence of
            source code. ............................................................... 44

        B.    Fintiv's policy arguments are irrelevant. .................... 50

III.   The District Court Correctly Concluded That Fintiv
Offered No Evidence That The Accused Products Meet
The "Widget" Limitations. ...................................................53

   A.    Fintiv offered no direct or circumstantial evidence
         of the claimed "widget." .............................................55

   B.    Fintiv's criticisms of the district court's decision
         are unavailing. ...........................................................63

         1.   Pointing to product functionality and
              assuming it involves a "widget" is speculation,
              not evidence.......................................................63

         2.   Fintiv's evidence does not create any
              reasonable inference of a widget. .......................68

         3.   Apple's use of the word "widget" in connection
              with unrelated, unaccused parts of its
              products is irrelevant to infringement. ..............72

         4.   This is not a "battle of the experts." ..................75

CONCLUSION ........................................................................77

CERTIFICATE OF COMPLIANCE

**<u>Statement Regarding Confidential Material Omitted</u>**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order

issued in the district court on August 7, 2019, two versions of this brief

are being filed with the Court: a confidential version that notes the

material marked confidential, and a nonconfidential version containing

appropriate redactions.  In the nonconfidential version of this brief,

confidential material has been deleted on pages 55, 57-59, 69-71, and

74. The deleted material consists of confidential Apple source code file

names.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
   811 F.3d 1334 (Fed. Cir. 2016) ........................................ 61

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   761 F.3d 1329 (Fed. Cir. 2014) ................................. 40, 41, 51, 52, 67

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000) .................................... 51, 56

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012) ........................................ 36

*Blueport Co. v. United States*,
   533 F.3d 1374 (Fed. Cir. 2008) ........................................ 49

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   469 F.3d 1005 (Fed. Cir. 2006) ........................................ 37

*E-Pass Techs., Inc. v. 3Com Corp*,
   473 F.3d 1213 (Fed. Cir. 2007) ........................................ 59

*Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*,
   99 F. App'x 911 (Fed. Cir. 2004) ........................................ 76

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
   424 F.3d 1276 (Fed. Cir. 2005) ........................................ 74

*Finjan LLC v. SonicWall, Inc.*,
   84 F.4th 963 (Fed. Cir. 2023) ...................................... 38, 39

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
   589 F.3d 1179 (Fed. Cir. 2009) ................................. 36, 51, 56, 61, 77

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   572 U.S. 915 (2015) ...................................... 37, 41

ix

*Liquid Dynamics Corp. v. Vaughan Co.*,
    449 F.3d 1209 (Fed. Cir. 2006) .................................................. 60, 75

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) .................................................... 17, 38

*MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*,
    731 F.3d 1258 (Fed. Cir. 2013) ........................................... 76

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
    527 F.3d 1330 (Fed. Cir. 2008) ............................... 67, 68, 76

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
    55 F.4th 1354 (Fed. Cir. 2022) ........................................... 32

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ......................................... 34

*Packet Intel. LLC v. NetScout Sys.*,
    965 F.3d 1299 (Fed. Cir. 2020) .................................. 40, 41

*In re Samsung Elecs. Co.*,
    No. 22-mc-800005, 2022 WL 425579 (N.D. Cal. Feb. 11, 2022)......... 52

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ........................................... 35

*Traxcell Techs., LLC v. Sprint Commc'ns Co.*,
    15 F.4th 1121 (Fed. Cir. 2021) ........................................... 50

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016) ..................................... 65, 66

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013) ....................... 51, 67, 72, 75

*Wi-Lan Inc. v. Sharp Elecs. Corp.*,
    992 F.3d 1366 (Fed. Cir. 2021) ....................................... 49

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018) ....................................... 63

**Rules**

Fed. R. Civ. P. 56(c) .................................................................. 50

**Other Authorities**

General Motors Corp., *'Round and 'Round* (1939),
    https://archive.org/details/Roundand1939 ......................................... 1

George T. Curtis, *A Treatise on the Law of Patents for Useful
    Inventions* (4th ed. 1873) ...................................................... 38

## STATEMENT OF RELATED CASES

Two petitions for a writ of mandamus from the same district court action were previously before this Court: *In re Apple Inc.*, No. 21-187 (Fed. Cir. Oct. 1, 2021) (Judges Dyk, Prost, and Hughes), *available at* 2021 WL 4485016; and *In re Apple Inc.*, No. 20-104 (Fed. Cir. Dec. 20, 2019) (Judges Moore, O'Malley, and Stoll), *available at* 2019 WL 13095535.

Counsel are not aware of any cases in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal, within the meaning of Fed. Cir. R. 47.5(b) and the accompanying practice note.

# INTRODUCTION

In common parlance, a "widget" is a placeholder term:  "A widget might be a radio, a refrigerator, a musical instrument, or a motorcar.  A widget, you know, is just a symbol for any manufactured product that people use."[1]  A "widget" can be anything one likes.

But in patent parlance, the words of a claim have meaning.  And in the context of U.S. Patent No. 8,843,125, which describes a system and method for managing a virtual wallet, a "widget" is a specific thing.  As the specification describes, the "widget" is one of three related pieces of software that together function as a virtual card in that virtual wallet.  The district court therefore construed the term "widget" to be "software," and Fintiv notably does not challenge that construction on appeal.  Nonetheless, it tries to evade its obligation to identify widget software in the accused products.  It argues that it need not actually show that the accused products have widget software, even though the asserted claims recite either method steps performed on a "widget" or components configured to do things with a "widget."  And it pretends

---

[1] General Motors Corp., *'Round and 'Round* at 1:02 (1939), https://archive.org/details/Roundand1939.

that the district court imposed an unduly strict burden of proof by demanding evidence of source code specifically, even though the district court expressly disavowed such a requirement and reviewed all of the evidence that Fintiv offered—much of which happened to be source code.

Fintiv makes these flawed arguments for one simple reason: the accused mobile payment features in Apple's devices are not structured like the patent contemplates and, among other differences, do not use a widget.  It is therefore unsurprising that Fintiv could not muster evidence to create a genuine dispute of fact on infringement.  The district court properly assessed everything Fintiv offered—from the source code files that its expert disavowed at his deposition, to the screenshots that he speculated could have a widget behind them, to Fintiv's attorney argument about unaccused aspects of Apple's devices—and, despite giving Fintiv every reasonable inference, granted summary judgment because Fintiv could not identify a widget in the accused products and instead relied only on its expert's "speculation that there must be a widget somewhere." Appx10.

Even on appeal, Fintiv cannot commit to what the widget in Apple's products supposedly is. It repeatedly refers vaguely to the "functionality" of Apple's devices, even as it does not appeal from the district court's refusal to construe the "widget" to be mere "functionality," as Fintiv originally advocated. Appx63-67; *see, e.g.*, Opening Br. ("OB") 37, 40, 42, 46, 47, 54, 58, 59. And while Fintiv blames the district court and tries to cast this as a dispute about evidentiary burdens or reasonable inferences, the real problem with Fintiv's case is the same as it has been since it first filed this litigation more than five years ago: there is no widget in the accused devices, and Fintiv has no evidence suggesting otherwise. The Court should affirm the grant of summary judgment.

## STATEMENT OF THE ISSUES

1.      Whether the district court properly required Fintiv to identify "widget" software when every asserted claim requires a widget and the undisputed construction of that term is "software that is either an application or works with an application, and which may have a user interface."

2.      Whether the district court somehow imposed a requirement for Fintiv to cite source code, despite comprehensively reviewing the "source code and non-source code" evidence Fintiv offered, Appx8.

3.      Whether the district court properly granted summary judgment of non-infringement when Fintiv did not identify a widget in the accused devices and instead offered only evidence of things that were not a widget, paired with its expert's unfounded speculation that there must be a widget.

## STATEMENT OF THE CASE

### *SK C&C's CorFire Subsidiary Obtains The '125 Patent.*

U.S. Patent No. 8,843,125 issued in September 2014 and was originally assigned to SK C&C, headquartered in South Korea.  Appx85. At that time, SK C&C's subsidiary CorFire was focused on mobile commerce technology.  Appx4372.

The '125 patent, which stems from four provisional patent applications filed in December 2010, Appx85, describes then-existing technology for conducting commercial transactions using a mobile device.  As the patent describes, "mobile wallet functionality" at the time was on its way to "replac[ing] conventional physical wallets."

4

Appx92 1:32-36.  A mobile wallet, like a conventional wallet, might

contain various "payment cards, member cards, transportation cards,

and loyalty cards."  Appx92 1:43-46.  And, like the cards in a traditional

wallet, these cards could be used for "contactless" commercial

transactions, relying on Near Field Communication technology.  Appx92

1:55-62.  A user's sensitive account information could be protected by

storing those credentials in a "secure element (SE)" within the mobile

device.  Appx92 1:38-43.

    But the '125 patent inventors believed that a better system was

needed for managing "various payment applets residing within the

mobile device."  Appx92 1:65-67; *see also* Appx92 2:16-18.  They

identified three particular problems with existing mobile wallets:

(1) "the user may be unable to view any account specific information

stored within the SE or manage [payment] applications"; (2) "users may

often be bombarded with various applications that may be inapplicable

to the user," based on their "mobile device capabilities or mobile service

providers utilized"; and (3) because "various service providers operate

independently from one another," inefficiency results from the fact that

"each individual application is typically updated separately." Appx92 2:11-51.

The '125 patent purports to solve these problems by providing a system to manage the process of downloading, using, and updating various mobile wallet applications as well as the individual cards stored within the mobile wallet.

A user of the '125 patent invention first downloads a mobile wallet application. *See, e.g.*, Appx94 5:55-56; Appx97 12:6-19. To do so, the user's mobile device interacts with the server-side components of the system, which are detailed in Figure 1 (reproduced below with highlighting added):

6



Appx87; *see* Appx16730-16731.

The wallet management system (element 110) "store[s] and manage[s] mobile wallet account information." Appx93 3:32-33. It includes a "wallet client management" component (element 111) "responsible for the wallet application itself," along with a "[w]idget management component" (element 112) "responsible for the individual widgets stored within" the wallet application. Appx93-94 4:57-59, 5:4-6. The '125 patent explains that "[w]idgets may be an application configured to interface with a user of the mobile device" and "may refer

to individual payment applications, transportation applications, and other related applications." Appx94 5:6-9.

The server side of the system also includes components for managing the user's access to various software or services and addressing the "bombard[ment]" problem described by the patent (the second problem listed above at 5-6). These components include the trusted service manager or "TSM" (element 120), which "may act as an integration point for all of the external parties the mobile device may deal with," Appx94 5:43-44, *see* Appx94 5:28-31; the "Device Profile management component" (element 113), which can "store device specific information," Appx94 5:9-16; and the "Rule [E]ngine" (element 116), which "may filter widgets based on information related to the mobile device," Appx94 5:22-24.

The trusted service manager system receives and processes the user's request for a mobile wallet application. *See* Appx94 5:55-6:14. The result is reflected in Figure 2, reproduced below with highlighting added, which depicts the device-side components. The system will send both "the requested mobile wallet application" (element 24, highlighted in orange) and "an accompanying over-the-air (OTA) proxy program"

(highlighted in green) for installation and execution on the device.

Appx94 6:34-37. The OTA proxy consists of software responsible for

various interactions within the mobile device and between the device

and the server-side components. Appx94 6:52-67; Appx95 8:5-17;

Appx96 9:11-38; *see* Appx3154-3155.



Appx88; *see* Appx16733.

Once a mobile wallet application is installed, the user can add

cards to that wallet. Appx95 8:18-22. The mobile wallet application

"connects to the TSM system," which can then display "applications th[e] user may be interested in." Appx95 8:30-43; *see also* Appx96 10:9-13 (describing "dynamically filtering a list of mobile widget applications that are available for installation").

The user might, for example, want to add a VISA® contactless card to their mobile wallet. Appx95 8:60-62. To do so, the system must provision three separate but "corresponding" pieces of software: a widget, a contactless card applet, and a wallet management applet. Appx95 8:60-63. The widget, as noted above, will "reside in the mobile wallet application 24, at the application level, to provide an interface to the user." Appx95 8:63-65; *see also* Appx98 14:40. The contactless card applet and the wallet management applet are both installed within the device's secure element, as shown above in Figure 2. Appx96 9:25-30; *see also* Appx93 3:40-47; Appx98 14:40-45.

The reason for requiring two securely stored software elements for a single card is the restricted-access problem identified by the '125 patent inventors. *See supra* 5-6 (first item in list). Issuers of contactless card applets typically prevent a user from accessing the applet directly. *See* Appx92 2:6-15; *see also* Appx1816 ('846 provisional

application).  According to the '125 patent, the wallet management applet addresses this problem.  Like the contactless card applet, the wallet management applet stores sensitive account-specific information (such as a credit card number for the VISA® applet).  But, unlike the contactless card applet, the user can "view and manage the information stored in the WMA 21 applet through the corresponding widget." Appx95-96 8:66-9:5.  The user's ability to interact with the widget to access the information stored in the wallet management applet thus addresses the restricted-access problem the '125 patent purported to solve.  *See* OB9.

The '125 patent also purports to address the third problem that the inventors identified in prior-art mobile wallet systems: inefficiency from having to separately update applications offered by varying service providers.  Appx92 2:45-51; *see supra* 5-6.  The patent describes how these service providers can interact with the trusted service manager system to arrange for updates, which are then provided to the user's device.  Appx97 11:13-53.

The '125 patent includes five independent claims, three of which are relevant here.  Claim 11 recites a "method for provisioning a

11

contactless card applet in a mobile device comprising a mobile wallet application." Appx98 13:16-17. Echoing the specification, the claim includes steps of activating the mobile wallet application, connecting to the trusted service manager system and synchronizing the mobile wallet application with that system, displaying a contactless card applet based on attributes of the mobile device, retrieving a widget and a wallet management applet corresponding to a selected contactless card applet, and provisioning all three items. Appx98 13:16-30. Claim 18 recites a "wallet management system" that includes the server-side components discussed above: a "wallet client management component configured to store and to manage a mobile wallet application," a "widget management component configured to store and to manage widgets," a "device profile management component," and a "rule engine." Appx98 14:7-16. Claim 23 recites a mobile device comprising the components depicted above in Figure 2: a "secure element"; a "mobile wallet application configured to store a widget corresponding to a contactless card applet," the contactless card element being "stored in the [secure element]" along with a "corresponding" "wallet management applet"; and an "over-the-air (OTA) proxy." Appx98 14:38-53.

***Fintiv Acquires The '125 Patent And Asserts It Against Apple.***

Fintiv, the appellant here, was previously a financial technology startup known as Mozido. Appx530; *see* Appx507-510. In 2014, Mozido acquired SK C&C's CorFire subsidiary. Appx6409. Along with that acquisition, the '125 patent was assigned from SK C&C to Mozido CorFire – Korea, Ltd. Appx431-432. Fintiv acquired rights to the patent on December 18, 2018. Appx431-432.

Three days later, Fintiv filed this lawsuit against Apple. Appx108. Broadly, Fintiv accuses a host of Apple devices of infringing several claims of the '125 patent through use of the Wallet application, Apple Pay functionality, or both.[2] Wallet is an application on Apple iPhone and Watch devices. Appx15293; Appx18693; Appx16107-Appx16110. Apple Pay allows users to complete mobile payment transactions securely, including with cards in the Wallet application. Appx15292; Appx18698-18699.

---

[2] Originally, Fintiv accused the Wallet and Apple Pay functionality in Apple's iPhone and Watch devices. Appx263; *see* Appx4305. Fintiv later received leave to add Apple's iPad and Mac computer devices, which do not include Wallet but allow users to make secure online payments using Apple Pay. Appx3816; Appx10029; Appx15161-15162; Appx6501-6502. Fintiv's brief, like its summary judgment arguments, does not account for any differences in the accused products.

Apple's products are designed from a fundamentally different premise than the system described in the '125 patent. While the patent contemplates a world in which users can select and download different mobile wallet applications provided by various third parties, then populate those wallets with individual card software also provided by third parties, "Apple Wallet and Apple Pay exist only in a closed system architecture." Appx15434. A user of an Apple device cannot install third-party mobile wallet applications that have access to the device's secure element. Appx15434. Indeed, users do not even choose to install Apple's Wallet application; it is built into the device's operating system. Appx15435; Appx16110-16113; Appx18696.

When a user wants to add a card to their Wallet—for example, to add their VISA® card as a payment option—they enter the card information either manually or by taking a picture of the card with the device. Appx16116; Appx4244-4245. The device transmits this information to Apple Pay servers, which then engage in a complex series of communications with third parties, such as the card issuer and a fraud-prevention system. Appx16114-16119; Appx18699.

The servers also provide a pass package that contains data the device's operating system will use to display that particular card to the user, including a PNG or PDF image file representing the card and a configuration file containing metadata—that is, data about data—related to depicting the card on-screen. Appx14055-14064; *see* Appx14051-14052. Unlike the '125 patent invention, however, the accused Apple devices are not designed to allow a user to access sensitive card-related information stored in the secure element. Indeed, the user's actual credit card number is not stored *anywhere* on the Apple device—a special encrypted number is used instead, and even this number is not visible to the user. *See* Appx16119-16120; Appx18675-18676; Appx18701; Appx18790. There is therefore no need for an interactive "widget" to allow the user to access securely stored information. *Compare supra* 11.

### *Despite Extensive Discovery, Fintiv Repeatedly Fails To Articulate A Theory Of Infringement That Includes A Widget.*

Fintiv's infringement theories suffered from several weaknesses.[3] But chief among them was the basic problem that Apple Pay and Wallet are not structured as the '125 patent claims contemplate and therefore lack, among other things, a "widget" as recited in the claims.

Fintiv struggled throughout the case to articulate what constituted the "widget" in Apple's accused products. In its first two complaints, Fintiv alleged that "the Apple Devices are enabled to retrieve a widget and a wallet management applet (WMA) corresponding to the contactless card applet"—while citing an Apple document that did not directly support that assertion. Appx274-275; Appx329-330. Its preliminary infringement contentions likewise included clips from Apple documents that did not refer to a "widget" or make clear what Fintiv asserted the alleged widget was. *See* Appx4615-4616; Appx4737-4738.

---

[3] Apple reserves the right to pursue all non-infringement and other arguments it raised to the district court, including its other summary judgment grounds, in the event of a remand.

Fintiv tried to solve the problem at the *Markman* stage, arguing that the term "widget" should be given its "[p]lain and ordinary meaning." Appx2210. Fintiv fought the idea that a widget had to be software, as Apple had proposed. Appx1763-1767. It took the position that a widget could be essentially *anything* card-related, offering the nebulous alternative construction of "integrated functionality that relates to applications related to a financial institution, transportation account, and the like." Appx2210; *see also* Appx2496; Appx2600.

The district court did not fully adopt either party's position. The district court "agree[d] with Apple" that it could not "simply order that 'widget' should bear its plain-and-ordinary meaning." Appx63. In particular, the district court was concerned that a lay jury might "incorrectly apply the non-technical" meaning of "widget" as any generic "gizmo." Appx63-64. And the district court deemed Fintiv's "integrated functionality" proposal to be "vague, confusing, [and] unclear." Appx64. On the other hand, it found Apple's construction unduly restrictive in two ways: (1) requiring that the widget software be "an application," whereas the '125 patent also permitted it to be "code, *e.g.*, a 'plug-in,' that runs within an application"; and (2) requiring that the widget

17

software have a user interface, whereas the '125 patent described this as optional. Appx65-66. The district court therefore construed "widget" to have the "plain-and-ordinary meaning" of "software that is either an application or works with an application, and which may have a user interface." Appx67; *accord* Appx3094-3095; Appx3154.

Fintiv therefore had to come up with some actual software—not just "functionality"—that could satisfy the widget limitations. In its final infringement contentions, Fintiv included undifferentiated string cites of Apple source code files and stated generically that "[t]he Apple source code produced to date describes how the Apple Accused Products" meet each limitation reciting a widget. Appx4869-4871; Appx4906-4914; Appx4924-4925; Appx4930-4939; Appx4962-4971; Appx4978-4983. Apple identified this and other deficiencies, explaining that Fintiv's contentions "fail[ed] to adequately identify what Fintiv contends is the widget in the accused products" or to "distinguish between what Fintiv contends is the WMA, the widget, and the contactless card applet, thus leaving Apple to guess what Fintiv contends is the widget." Appx10448-10449; *see also* Appx10036-10037. In response, Fintiv agreed to provide amended contentions after

conducting further review of Apple's source code.  Appx10453-10455; *see* Appx10030-10031.

But even after completing this review, *see* Appx4295, Appx4320, Fintiv's amended infringement contentions still "fail[ed] to identify any software in the Accused products as a 'widget,'" as Apple explained to the district court in a motion to strike.  Appx10032.  Instead, Fintiv "refer[red] to images or other non-executable data, neither of which is 'software.'"  Appx10032 (citing Appx10804-10809; Appx10828-10832; Appx10871-10873; Appx10889-10892; Appx10987-10988; and Appx11054-11056).  For example, Fintiv contended, with no elaboration, that the following screenshots "illustrated" how the accused iPhone devices satisfied claim 11's step of "retrieving a widget and a wallet management applet (WMA) corresponding to the contactless card applet":



Appx10804. And while Fintiv insisted that "the widgets are more than just images" and "are interactive software," its citations to technical documents repeatedly referred only to "card art" or "artwork," not any software. Appx8134-8135; *see* Appx9812-9813. The district court declined to resolve the dispute at this stage, noting that the contentions had been overtaken by Fintiv's expert report, that Fintiv would be "limited by what is in the expert report," and that Apple could file a summary judgment or *Daubert* motion if it thought the expert report contained "insufficient evidence." Appx13877.

Fintiv's expert report, provided by Dr. Michael Shamos, did not cure the deficiencies. Dr. Shamos opined, with respect to claim 11, that the accused iPhone products retrieve "a software (a 'widget')" associated with a card that "allows a user to, for example, view the card's details or

perform transactions." Appx18767. But he did not specify what that supposed widget software *is*. Instead, Dr. Shamos included a string citation to numerous Apple source code files without specifying which, if any, of those files he contended was a "widget." Appx18767. Dr. Shamos repeated this same string citation for every accused device. Appx18772-18773 (Watch); Appx18778-18779 (iPad); Appx18783-18784 (Mac).

For claim 11's step of "provisioning … the widget," Dr. Shamos relied solely on the following screenshots from Apple's iPhone device:



Appx18790-18791. Although Dr. Shamos contended that "[e]ach screenshot … presents a software (with a user interface)" that allows a user to, for example, "view the card's details or perform transactions," he did not identify any such software by citing source code, technical documents, or anything else—he simply relied on the images.

21

Appx18790-18791.  Here too, Dr. Shamos repeated this screenshot

approach for each accused device.  Appx18794-18795 (Watch);

Appx18799 (iPad); Appx18803-18804 (Mac).

Dr. Shamos's opinions for the "widget" limitations of claims 18 and

23 likewise relied on undifferentiated string citations to source code

files, screenshots of Apple's products, and vague references to

unspecified "card image code" and so-called "metadata code."

Appx18855-18856; Appx18882-18892.  *But see* Appx15248 (striking

"code" from "metadata code").  Nowhere in his three-hundred page

report, however, did Dr. Shamos identify any piece of software—or any

combination of software files—as the claimed "widget."

Apple attempted to elicit some clarification from Dr. Shamos at

his deposition.  Instead, Dr. Shamos admitted that his report—despite

its laundry list of source code files—"doesn't identify the source code of

the widget" or include "a list of the source code components that make

up the widget."  Appx15244-15245.  Apple asked Dr. Shamos about each

specific software file that he had cited; for each one, Dr. Shamos said it

was not the widget.  Appx15233; Appx15235; Appx15239-15243.  Dr.

Shamos further testified that he "d[id]n't know" which widgets are

retrieved from Apple's servers, Appx15234; "d[id]n't know" "what component is responsible for storing the widget on the server," Appx15251-15252; and "d[id]n't know" "what application stores the widget" on each accused Apple device, Appx15250.  And, despite his heavy reliance on screenshots showing images of virtual cards, Dr. Shamos testified that card art "may or may not be" the widget, Appx18960-18961, depending on whether it has "executable code," but that he "d[id]n't know" whether the card art files in Apple's accused devices had executable code in them.  Appx15247-15248; *see also* Appx15247 (testifying that "you can't tell any code" from the screenshot images because "there is no code in the—in the drawing at all").

Apple moved for summary judgment, explaining that Fintiv had "failed to identify any software code in the accused products that meets the 'widget' limitations" and that "undisputed facts confirm the accused products do not use and are not configured to use a 'widget.'" Appx15171-15179; *see* Appx15428-15431 (declaration of Apple Pay Senior Manager); Appx15436-15453 (report of Apple's technical expert). Fintiv's opposition continued to cite the same source code files that Dr. Shamos had denied being the widget; relied on the screenshots that Dr.

Shamos had admitted did not show widget software; and included new attorney argument about why Fintiv supposedly did not have to identify any widget software code to prove infringement and about other functions of Apple's accused devices that Fintiv's expert had not discussed. *See* Appx18603-18617.

The district court took up the parties' summary judgment motions at the pretrial conference in September 2021, shortly before trial was then set to begin. Appx152. Apple and Fintiv each laid out their arguments on the "widget" issue, among others. Appx26284-26304. The district court asked no questions of either side on the topic. After a brief recess, the district court stated categorically, "The Court is going to deny the motions for summary judgment." Appx26304. The district court provided no reasoning behind its decision and no explanation of how Fintiv had created a genuine issue of fact as to the existence of a widget. And, although the minute entry for the hearing indicated that "There will be an Order forthcoming with the Court's rulings," Appx152, the district court never issued such an order or otherwise provided the parties with its reasoning for denying summary judgment on the "widget" issue.

### *The District Court Grants Summary Judgment Of Non-Infringement Based On Fintiv's Failure To Identify A Widget.*

The case did not proceed to trial in October 2021 as expected; after two postponements, trial was rescheduled for June 2022. Appx153-154. Two weeks before the rescheduled trial was set to begin, Fintiv filed an emergency motion seeking to reopen discovery and postpone the trial. Appx26503-26514. Fintiv's "emergency" was, in reality, a last-ditch effort to convince the district court to allow it to inject a claim for willful infringement into this case—an effort Fintiv had tried and failed at multiple times before.

Two years earlier, the district court had denied Fintiv's request to amend its complaint to add allegations about Apple's supposed pre-suit interactions with SK C&C or Mozido, finding a lack of good cause for the late amendment and expressing a "very strong feeling" that amendment would "be futile." Appx10009-10010. Similarly, the district court rejected Fintiv's attempt to rely on these same allegations to support an indirect infringement claim. Appx13-14.

Fintiv's eve-of-trial emergency stemmed from its supposed "uncover[ing]" of new documents related to the same flawed allegations. Appx26503-26505. Fintiv's contentions were neither new nor relevant.

25

Appx26908-26922.[4]  Nonetheless, Fintiv persuaded the district court to

postpone the trial and allow both parties to take additional depositions

and discovery.  Appx23-25.  Fintiv never pursued those depositions,

however, and it delayed for months without seeking the written

discovery it had supposedly needed so urgently.

Finally, the case was again set for trial in July 2023.  Appx27232.

The district court asked the parties to identify outstanding items for

resolution at the pretrial conference, and Apple requested to present

further oral argument on its summary judgment motion regarding the

"widget" limitations.  The district court instructed the parties to be

prepared to re-argue this motion.

During the hearing, Apple again demonstrated Fintiv's failure to

identify any "widget" software in the accused devices.  Appx27234-

27300.  The district court acknowledged that Fintiv's expert said "that

---

[4] Nor were Fintiv's allegations true.  Fintiv falsely states that Apple
"met with the original owner of the '125 patent, SK C&C (d/b/a
CorFire), to gather confidential and proprietary information."  OB10;
*see also* OB3.  In support, Fintiv cites the same evidence that Apple
already debunked.  *See* Appx26912-26913.  Regardless, Apple notes that
Fintiv has chosen not to challenge the district court's rulings preventing
Fintiv from pursuing willful or indirect infringement claims, despite
listing those rulings in its notice of appeal.  Appx27676-27679.

he thinks that there is a widget," but it repeatedly challenged Fintiv's counsel to show "[w]here in his report" Dr. Shamos had "provide[d] the basis of that opinion." Appx27268. At the end of this two-hour hearing, the district court indicated that it was "going to grant the motion for summary judgment." Appx27298.

The district court issued its written opinion shortly thereafter, finding "that the record is devoid of evidence that the accused products practice the 'widget' limitation under the Court's construction." Appx4. The district court began with Dr. Shamos's string cite to Apple's source code files and explained, as discussed above, that Dr. Shamos had "confirmed that none of those files is a 'widget.'" Appx6. The district court also relied on Dr. Shamos's testimony that "none of the software files cited in other parts of his report constitutes a 'widget.'" Appx6; *see also* Appx9-10.

The district court then considered and rejected each of Fintiv's arguments for how it could nonetheless survive summary judgment. It explained, contrary to Fintiv's argument, that Apple was not "misreading the construction of 'widget' to require 'software code.'" Appx7. Rather, Apple was "showing the complete devoid of evidence Dr.

Shamos presented in his expert report to prove infringement." Appx7.

And, unlike in the authority Fintiv cited, access to source code was not

an issue: "Here, Dr. Shamos had Apple's source code, but still found no

'widget.'" Appx7 n.1.

The district court also reviewed the evidence cited in Fintiv's

opposition—"source code and non-source code"—and explained why it

was insufficient. Appx8. In particular, the district court rejected

Fintiv's conjecture (echoing Dr. Shamos's deposition testimony) that

there *can* be executable code underlying an image file, because

"speculation is not a substitute for evidence." Appx8. And it rejected

the screenshots that featured prominently in Dr. Shamos's report,

explaining that "neither Dr. Shamos nor Fintiv can identify specifically

what in these screenshots is the claimed 'widget.'" Appx9.

The district court concluded by citing "settled Federal Circuit law"

that required actual evidence—not conclusory or unsupported

assertions—to defeat a summary judgment motion. Appx10. "Simply

saying, 'it must be in there somewhere[,]' is no substitute for the

requirement that Fintiv" set forth specific facts "identify[ing] a 'widget'

in the accused card provisioning process." Appx10-11. Because Fintiv

"failed to demonstrate a genuinely disputed material fact, or indeed any facts at all, showing that Apple infringes the 'widget' limitation present in all asserted claims of the '125 patent," the district court granted Apple's motion for summary judgment of non-infringement. Appx11.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's grant of summary judgment based on Fintiv's failure to identify a "widget" under the undisputed construction of that term.

**I.** In the '125 patent, a "widget" is "software that is either an application or works with an application, and which may have a user interface." Appx66. Demonstrating that the accused products perform or are configured to perform actions on a widget, as the claims require, thus entails a showing that the claimed actions are taken upon the "software" of the court's unchallenged widget construction. That, in turn, necessarily requires identifying such software. Fintiv has no explanation for how it could show infringement of the "widget" limitations without identifying widget software, nor do any of its authorities or hypotheticals excuse it from its basic obligation to demonstrate infringement of every claim element.

**II.**  In properly holding Fintiv to its summary judgment burden to identify a *software* widget, the district court did not impose a *source code* requirement; on the contrary, the district court expressly rejected Fintiv's complaint, now renewed on appeal, that it was being held to such a requirement.  The district court's decision demonstrates that all it required was evidence of *software* that met its construction.  It carefully reviewed the evidence that Fintiv presented—"source code *and* non-source code," Appx8 (emphasis added)—and concluded that Fintiv's evidence did not create a material dispute of fact over the widget limitations.  This case thus involves a straightforward application of the settled summary judgment standard, as the district court recognized.  There is no lurking source code requirement, and likewise no lurking threat of an "extreme" or "unworkable precedent in patent litigation." OB60 (capitalization altered).

**III.**  The district court correctly determined that none of Fintiv's evidence creates a genuine dispute of material fact about the existence of "widget" software in the accused products.  Although Dr. Shamos cited numerous source code files, he conceded that none of them was the claimed widget or even part of a widget.  And while he testified that

some source code files *act on* widgets, he never explained what any of those source code files do, what they are acting on, or why a skilled artisan would understand that the thing they act on is software that qualifies as a "widget."  Similarly, while Dr. Shamos relied on screenshots depicting virtual cards in Apple devices, neither Dr. Shamos nor Fintiv can articulate what in the screenshots supposedly is the claimed widget.  Dr. Shamos insisted that widget software is behind the card image, but he admitted he did not find any such software in his investigation, and Fintiv still identifies none on appeal—because it is not there.

Fintiv's appeal brief levels many attacks on the district court, faulting it for supposedly failing to draw reasonable inferences in favor of a non-moving party, or improperly assessing expert credibility, or overlooking evidence.  The district court did none of these things.  It applied well-settled law requiring a plaintiff at summary judgment to put forth evidence—not speculation or attorney argument—sufficient to create a genuine factual dispute about whether an accused product infringes the asserted patent claims.  Fintiv did not do this.  And the district court properly granted summary judgment.

## ARGUMENT

Each of Fintiv's asserted patent claims recites a "widget," which the district court construed to mean "software that is either an application or works with an application, and which may have a user interface." Appx67. Fintiv does not challenge that construction on appeal. *See* OB32-33.[5] It is therefore undisputed that a "widget" must be "software," and thus that Fintiv must introduce evidence that such software "exist[s]" and is used "in the accused products" to satisfy the claims. OB22. Fintiv failed to do so. The district court recognized that "the record is devoid of evidence that the accused products practice the 'widget' limitation under the Court's construction." Appx4. Accordingly, the district court granted summary judgment of non-infringement. Appx11.

Fintiv cannot avoid this simple but fundamental problem with its case: the district court rejected Fintiv's attempt to reduce the claimed widget to any generic "gizmo" or "functionality," Appx63-64; the

---

[5] Because Fintiv did not challenge the construction of "widget" in its opening brief, it has waived the right to do so on reply. *See, e.g.*, *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1362 n. 7 (Fed. Cir. 2022).

unchallenged claim construction of "widget" instead requires "software" meeting the widget-related claim limitations, Appx67; and there is no evidence of any such software in the accused products, Appx4-11. Instead, Fintiv tries to change the question presented by this appeal. It argues that it need not offer any evidence of a widget in order to show infringement of patent claims that are replete with references to widgets and actions performed on those widgets. This novel argument, unsurprisingly, finds no support in logic or law. *Infra* Part I. Fintiv then accuses the district court of demanding proof not merely of widget "software" but of widget "source code"—a burden the district court did not impose and expressly repudiated. *Infra* Part II. Neither argument can relieve Fintiv of its summary-judgment burden to show evidence of a "widget."

When Fintiv at last confronts that burden, it cannot overcome it. Fintiv, like its expert Dr. Shamos, never actually says what the "widget" in Apple's accused products supposedly is. Instead, like Dr. Shamos, Fintiv points to a bunch of things that are *not* the widget and insists a widget must also be there. The district court properly held that Fintiv's inability to identify a widget or otherwise create a factual

dispute about its existence warranted summary judgment of non-

infringement. *Infra* Part III. This Court should affirm.

## I. The Claims Require—And Fintiv Must Identify— "Software" That Constitutes A "Widget."

Fintiv opens its appeal by arguing that the district court "erred by

requiring evidence of 'widget' code when the claims only require code

that *acts upon* the widget." OB28; *see* OB28-32. According to Fintiv,

"[n]o asserted claim requires the accused device to comprise simply 'a

widget,'" so no evidence of a widget is required. OB30.

While Fintiv is correct that the asserted claims recite actions

performed on widgets, it is wrong about the implications for

infringement. Fintiv's error is clearest when considering the asserted

method claims. Independent claim 11 is a method claim "for

provisioning a contactless card applet"; both it and asserted dependent

claims 13 and 14 require steps of "retrieving a widget" and

"provisioning … the widget." Appx98 13:16, 13:26-30. "Method claims

are only infringed when the claimed process is performed." *Ormco

Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). Fintiv

therefore cannot prove infringement of its asserted method claims

without showing that a widget is, in fact, "retriev[ed]" and

34

"provision[ed]" in the accused products. Appx98 13:26-30. Such a showing necessarily requires proof of a widget, and the district court's unchallenged claim construction requires that widget to be software.

Fintiv's argument is no stronger for the asserted system and device claims. Independent claim 18 (and thus dependent claim 20), directed to a "wallet management system," recites both a "widget management component configured to store and manage widgets" and a rule engine "configured to filter a widget." Appx98 14:7-16. And independent claim 23 (plus dependent claims 24 and 25), directed to a mobile device, recites a mobile wallet application "configured to store a widget" and an over-the-air proxy "configured to provision … a widget." Appx98 14:38-49.

Claim 18 does not recite merely a "management component"—it recites a "*widget* management component configured to store and to manage *widgets*." Appx98 14:12-13 (emphasis added). Satisfying that limitation necessarily entails showing a component configured to store and manage widget software (rather than something else). *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) ("To establish literal infringement, every limitation set forth in a

35

claim must be found in an accused product, exactly.").  Likewise, showing that particular elements are "configured to" store, manage, filter, or provision widgets (as claims 18 and 23 recite) requires showing that those elements are designed to act on widget software specifically. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (equating "configured to" and "adapted to," both of which require proof of an element designed to "accomplish the specified objective").

To survive summary judgment, then, Fintiv had to put forward evidence to create a genuine dispute that the accused products perform (or are configured to perform) the claimed acts upon some software that would meet the district court's unchallenged construction of "widget." Unless Fintiv can identify software that it claims constitutes a widget, "a reasonable juror would not be able to determine that those allegedly infringing components are actually present." *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1185 (Fed. Cir. 2009).

Fintiv concedes, as it must, that it bore that burden.  *See* OB32 ("[I]t is certainly true that there must be some direct or circumstantial evidence that the accused product code acts upon widgets.").  But its

arguments, in substance, resist the obligation. Fintiv has no explanation for how it could—let alone did—demonstrate that the accused products retrieve, provision, store, manage, and filter widget software without identifying what the alleged widget software is. But it nonetheless insists it was not obligated to do so. *See, e.g.*, OB24 (criticizing the alleged "demand" that Fintiv present "evidence of specific 'widget' software code").

Accepting Fintiv's argument would violate "the basic patent law principle that claim language defines the scope of an invention and every limitation is material." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1016 (Fed. Cir. 2006). Fintiv's '125 patent, like every patent, is a "conferral of rights in a particular claimed set of elements," and Fintiv's rights "extend only to the claimed combination of elements, and no further." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014). That claimed combination of elements includes actions taken upon a widget (or components configured to perform such acts). And "widget" as used in the claims has a particular meaning by virtue of the district court's claim construction. That construction, too, defines the scope of the patent

claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc) ("When a court construes the claims of the patent, it 'is as if the construction fixed by the court had been incorporated in the specification," such that "the court is defining the federal legal rights created by the patent document." (quoting George T. Curtis, *A Treatise on the Law of Patents for Useful Inventions* § 452, at 609 (4th ed. 1873)). If Fintiv wants to assert its monopoly rights, it must show that the allegedly infringing product actually meets all elements of the claim, including by identifying widget software.

This Court's recent decision in *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963 (Fed. Cir. 2023), is instructive. The asserted claim covered a "system for managing Downloadables," with limitations reciting a "receiver for receiving an incoming Downloadable," a "Downloadable scanner" for deriving data "for the Downloadable," and a database manager for storing "the Downloadable security profile data." *Id.* at 966. The undisputed construction of "Downloadable" was "an executable application program." *Id.* at 967. Like here, the claim did not require that the accused system "comprise simply" a Downloadable, as Fintiv puts it (OB30).

But, to survive summary judgment, the *Finjan* plaintiff nonetheless had to provide evidence of an executable application program. This requirement, the Court explained, "flows from the parties' agreed upon construction." 84 F.4th at 970. The problem for the plaintiff was that the accused products did not download executable application programs but rather unassembled packets of data—data that was neither extracted nor reassembled into executables while present on the accused devices. *Id.* And "a device that merely receives and forwards packets … does not receive a downloadable, under the parties' agreed-upon construction, because that device does not receive an executable application program." *Id.* at 971. The patentee could not avoid summary judgment with the general assertion that "'every device on the Internet' … receives program files in the same way," and that "way" infringes the claim. *See id.* Because the defendant had presented unrebutted evidence of how its devices operated, and because the patentee had "never identified evidence challenging" that showing, summary judgment of non-infringement was warranted. *Id.*

Fintiv likewise failed to present any evidence of widget software, *see infra* Part III, so it attempts to evade the language of the claims and

the unchallenged construction.  Fintiv repeatedly invokes a handful of irrelevant cases, starting with *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 761 F.3d 1329 (Fed. Cir. 2014).  *See* OB25, 33, 35, 44, 47.  But *Amdocs* cannot help Fintiv.  As Fintiv admits (OB28-29), the problem in that case was that the district court demanded proof of a claim limitation that did not exist.  The claims recited "enhancing" various records, and the district court construed the claims to require that enhancement occur "close to the source" of "network records."  761 F.3d at 1332-36, 1343.  Yet the district court also demanded proof that the accused system *generate* "output records" close to that same source.  *Id.* at 1343.  This, the Court held, was improper: generation and enhancement were separate processes, and nothing in the claims or the district court's constructions limited the location of record generation, as opposed to record enhancement.  *Id.*  Here, however, the district court's claim construction, which Fintiv does not dispute on appeal, requires widgets to be software, and the district court properly demanded proof of such software to show infringement.

Fintiv's citation to *Packet Intelligence* suffers from the same defect.  OB28-29.  There, the accused infringer attempted to overturn a

jury verdict by arguing that its products did not "correlate" flow entries. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1306 (Fed. Cir. 2020). But, as this Court held, that was irrelevant; the claims recited only "memory for *storing* flow entries," which did "not require the added action of correlating connection flow entries." *Id.* In other words, the issue in both *Amdocs* and *Packet Intelligence* was not whether the patent owner had to show proof of the object on which the claimed actions were performed—it was which actions were required in the first place.

Fintiv's hypothetical patent claiming "software for 'retrieving a photo'" is also beside the point. OB32. Fintiv argues that identifying "code for [the] photo itself" would be unnecessary to demonstrate infringement. OB32. But even in Fintiv's hypothetical, the patentee would have to show that the accused device retrieves a "photo"; retrieving something else would not do. In particular, if "retrieving a photo" were a step in a method claim (as "retrieving a widget" is in claim 11), it would certainly not be "an evidentiary step that goes too far," OB32, to require proof that a photo is actually retrieved. *See, e.g.*, *Limelight*, 572 U.S. at 921 (method claim "not infringed unless all the

41

steps are carried out").  Fintiv's hypothetical does not relieve it of the

burden to provide proof of a widget under the undisputed construction.

Fintiv's odd complaint that the district court looked for the

"widget" in "software *in the accused products*," OB30 (quoting Appx4),

also does not help it evade the claim requirements.  Fintiv has always

taken the position that the alleged widget is in Apple's products.  For

example, when asked by Fintiv's counsel whether he was "prepared to

testify at trial that there is a widget *in the accused Apple devices* that

infringes the claims of the '125 patent," Dr. Shamos answered

unambiguously: "Yes."  Appx18985-18986 (emphasis added).  He

repeatedly made similar statements, as did Fintiv's counsel.  *See*

Appx18985 (Fintiv counsel: "[I]t is your opinion that … there is a widget

on the accused devices that infringes the claims of the '125 patent?" Dr.

Shamos: "Yes."); Appx18983-18984 (agreeing with Fintiv's counsel that

"code modules" and "source code pages" "indicate the presence of

widgets in the accused Apple devices"); *see also* Appx27267-27268

(Fintiv emphasizing same at summary judgment hearing).  Having

repeatedly characterized its argument in that way, Fintiv can hardly

fault the district court for doing the same.

Fintiv tries to confuse the issue by suggesting that the widget code "does not necessarily reside in Apple's source code" because "third parties supply the widget for the product." OB31. Fintiv has never previously made such a suggestion. And Fintiv's only support for its newfound "third-party widget" theory—in a record that spans four and a half years, nearly 500 docket entries, twenty-six hearings, and hundreds of pages of expert reports, Appx108-158—is an apparent misstatement by Apple's counsel in a venue transfer hearing that took place months before claim construction or final infringement contentions. OB31 (citing Appx1595-1596); *see also* OB51-52 (same citation). Fintiv plainly was not misled by this errant statement when it happened. Despite having access to source code and other materials from the third party in question (NXP) and ample opportunity for discovery, *see* Appx4320, Fintiv never asserted, in its expert report or at summary judgment, that the alleged widget resides in software provided by NXP (or any other third party).

In sum, the district court did not "overlook[] the specific claim language." OB28 (capitalization altered). It was aware that the claims recite several different actions on a widget. Appx3. It simply found the

record "devoid of evidence" of a "widget" and therefore recognized that

Fintiv "failed to present evidence that the accused products practice"

the "'widget'-related limitations." Appx4-5.

## II. The District Court Properly Required Fintiv To Present Evidence Of Software Satisfying The "Widget" Limitations.

In addition to resisting the claim language regarding widgets,

Fintiv builds its appeal in opposition to a related conceit: what it calls

"the court's demand" and "Apple's demand" that "Fintiv present direct

evidence of … source code." OB24. But there was no demand for source

code evidence in this case. All the errors Fintiv stacks on top—from its

backdoor challenges to claim construction (*infra* Part II.A) to its

sweeping policy arguments (*infra* Part II.B)—fall along with its

mistaken premise.

### A. The district court did not demand evidence of source code.

Fintiv argues that "direct evidence of source code is not a

requirement to prove infringement, even of computer-implemented

claims." OB24; *see* OB24-28. Whether correct or not, Fintiv's

contention is irrelevant here: The district court did not grant summary

judgment because Fintiv lacked *source code* evidence. It granted

44

summary judgment because Fintiv lacked *any* evidence that Apple's accused products contain software satisfying the widget-related limitations. *See* Appx10 (citing Fintiv's "failure to identify software that constitutes the accused 'widget'").

Indeed, the district court expressly rejected the false narrative that Fintiv repeats on appeal. It recounted Fintiv's complaint that "Apple is misreading the construction of 'widget' to require 'software code' because the word 'code' is not in the Court's construction of 'widget' and source code is not the only way Fintiv can prove Apple's infringement." Appx7. And it rejected Fintiv's characterization: "Not so." Appx7. The district court continued: "Apple is not misconstruing the court's construction of 'widget' to require source code; Apple is showing the complete devoid of evidence that Dr. Shamos presented in his expert report to prove infringement." Appx7.

What Fintiv needed was some evidence that showed the existence of a widget, that is, of "software that is either an application or works with an application, and which may have a user interface." Appx66. Consistent with that unchallenged construction, the district court examined the "source code and non-source code" evidence that Fintiv

offered and looked for "an identifiable piece of software." Appx8; Appx10. But, as the district court recognized, Fintiv "never identified what 'software' *or* 'software code' comprises the claimed 'widget.'" Appx8 (emphasis added). Fintiv quotes this portion of the district court's opinion (OB26), but it refutes rather than supports Fintiv's argument: the district court was looking for "software" (whether identified by the underlying code or some other evidence) because the claim construction of widget requires "software." Appx66; *see also* OB32 (admitting district court's focus on software was due to claim construction of "widget").

Fintiv's other evidence of a supposed source-code requirement also fails. Fintiv cites an exchange where the district court asked Apple to respond to the notion that a widget "has to be [shown in] source code." Appx27254. Apple answered that Fintiv's source code complaint was just a semantic feint. The problem, Apple explained, was that while Fintiv presented a definition of software with "lots of examples," Fintiv had "never tied anything [it] showed [the court] in any of the expert report excerpts to anything in any of those definitions." Appx27254-27255.

Indeed, the record repeatedly refutes Fintiv's assertion that the district court or Apple "demand[ed]" source code evidence specifically, OB24, rather than evidence of "software" more broadly. *See* Appx27259 (Apple explaining Fintiv offered "no identification of the software[,] regardless of whether you call it source code or anything else"); Appx27242 ("they never actually point or tell us what the software is"); Appx27256 (Dr. Shamos "never actually identifies the software. It has to be software under some definition …."); Appx21604 (arguing Fintiv failed to identify "software"). Even Fintiv's own citation (at OB26) dispenses with its argument. Fintiv laments that, after Fintiv's counsel claimed that Dr. Shamos had identified "[n]ot source code but just card image code," the district court asked, "[W]here does he state that in his report? … [W]here does he in his report explain what the code is …?" Appx27274. But the district court was plainly responding to Fintiv's own insistence that it had shown evidence of supposed "card image code" for the widget. It is unremarkable that the district court, echoing Fintiv, used the word "code" in this exchange. *See also* Appx8 (addressing "source code module" that "Fintiv point[ed] to").

47

The district court certainly considered source code among the evidence it reviewed.  But it did so because *Fintiv* relied on source code throughout the case.  Fintiv's infringement contentions referred extensively to Apple's source code.  *See, e.g.*, Appx19104; Appx19125-19126; Appx19164; Appx19174; Appx19211; Appx19240-19241.  In its summary judgment opposition, Fintiv insisted that its expert had "identified relevant, specific source code for claim elements that contain a 'widget.'"  Appx18606; *see* Appx18983-18984 (Dr. Shamos testifying to code alleged to meet widget limitations).  And Fintiv maintained that position at both summary-judgment hearings.  *See, e.g.*, Appx27246 ("Fintiv cites source code … in Dr. Shamos' infringement report and during his deposition, … which contains evidence that the claim elements regarding the widget [are] met"); Appx27275-27276 (discussing "source code citations"); Appx26298 ("Dr. Shamos cites source code.").

Even on appeal, Fintiv concedes that "source code can be an effective way of proving infringement."  OB60.  That would be hard to deny.  Source code is strong evidence of how software operates because, as Fintiv's expert agreed, "normally" "software is written in source

code." Appx15238; *cf. Blueport Co. v. United States*, 533 F.3d 1374, 1377 n.1 (Fed. Cir. 2008) ("Source code is the text of a software program written in human-readable programming language."). Parties and their experts thus commonly turn to source code to demonstrate that software practices asserted claims. *See Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1376 (Fed. Cir. 2021) ("Wi-Lan argues that experts typically rely on … source code[] in reaching opinions about infringement. That is obviously correct."). The district court did not commit "legal error," OB28, in reviewing the source code evidence that Fintiv itself offered as proof.

Fintiv protests that the district court "disregard[ed] all other" evidence to support the "widget" limitation. OB28. That is false. For instance, Fintiv insists that its expert "directly identified the claimed widget" by pointing to card art and alleged underlying software, citing paragraphs 309 and 359 of Dr. Shamos's report (Appx18767-18768) and his deposition testimony on the same points (Appx18960-18961). OB27-28. The district court addressed that evidence at length, looking to "each of the source code files cited in paragraph 309" and Dr. Shamos's corresponding deposition testimony. Appx6. It likewise considered the

49

remaining evidence Fintiv accuses it of ignoring, from paragraph 359 to

Fintiv's broader speculation that infringing code underlies "the image of

a card on the screen." Appx8-9. The district court thus did not

"disregard" any of Fintiv's evidence. OB28. It simply determined that

all of Fintiv's evidence fell far short of creating a genuine dispute of fact

as to infringement. *See infra* Part III.

### B.    Fintiv's policy arguments are irrelevant.

Fintiv closes its brief attempting to inflate the stakes of this

straightforward summary judgment appeal with an argument that

requiring source code would be "burdensome" in a "multitude of cases."

OB61, OB23; *see* OB60-63. The district court imposed no source code

requirement here, so there is no reason why "[a]ffirmance of the district

court opinion would … result in a particularly onerous precedent."

OB60.

Affirmance instead follows from longstanding law that requires a

party to put forth enough evidence to create a material dispute of fact to

meet its burden on summary judgment. Fed. R. Civ. P. 56(c); *see, e.g.*,

*Traxcell Techs., LLC v. Sprint Commc'ns Co.*, 15 F.4th 1121, 1130 (Fed.

Cir. 2021) (affirming summary judgment where expert accused an

"alphabet soup of approaches" but "didn't explain how any of these approaches" would infringe); *Intell. Sci. & Tech.*, 589 F.3d at 1183-84 (affirming summary judgment of non-infringement where expert did "not pinpoint where [claimed] elements are found in the accused device"); *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046-48 (Fed. Cir. 2000) (affirming summary judgment of non-infringement where expert gave "nothing more than an unsupported assertion that the accused device contains a critical limitation").

That is what differentiates this case from the ones that Fintiv cites—not some phantom source-code requirement. Indeed, the Court in Fintiv's cited cases *endorsed* the parties' reliance on source code to prove their infringement contentions. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) ("Versata's expert explained SAP's source code to the jury."); *Amdocs*, 761 F.3d at 1341 (relying on "Amdocs' citations to … source code"). In *Versata*, the dispute was whether the plaintiff's expert had modified the defendant's source code in preparing his infringement demonstration—and the evidence showed he had not. 717 F.3d at 1261-63. In *Amdocs*, the dispute again was not whether source-code evidence was necessary but

rather *which* code was relevant.  The plaintiff had relied on "source code on the Installation CD" for the accused products, but the district court had demanded it instead show proof through certain "DSD scripts" that were provided separately.  *Amdocs*, 761 F.3d at 1341.  This Court reversed the summary judgment grant, reasoning in relevant part that the district court had "erred by discounting [plaintiff's] citations to source code on the FusionWorks installation CD."  *Id.* at 1342.  In other words, the very cases that Fintiv claims show that source code is *not* required in fact involved plaintiffs surviving summary judgment of non-infringement by *citing* source code in the accused products.  *See also In re Samsung Elecs. Co.*, No. 22-mc-80005, 2022 WL 425579, at *2 (N.D. Cal. Feb. 11, 2022) (granting request for third-party source code subpoena after finding that "the production of source code is necessary here," given claim language requiring logic coded in particular ways).

In all events, whether source code is mandatory or not, this case is hardly a poster child for plaintiffs deprived of the evidence necessary to shoulder their burden of proof.  *See, e.g.*, Appx3289-3291 (district court stressing that "whatever [plaintiff's counsel] tell me they need to have access to to satisfy the infringement contentions, they're probably going

52

to get"). Having received nearly all of the expansive discovery it sought throughout this litigation, Fintiv cannot now complain that it did not find the evidence it wanted. In particular, Fintiv does not—and cannot—argue that there was anything insufficient or unduly burdensome about its access to Apple's source code specifically. The parties agreed to a typical protective order that imposed identical review procedures on each. Appx1536; Appx1547-1556. Fintiv was able to access Apple's code in secure locations, Appx1549, and Apple even agreed to expand those locations to facilitate review, Appx4295. Fintiv was able to print excerpts of code, Appx1552, well beyond the 250-page allowance to which the parties initially agreed. *Cf.* Appx15245-15246. Whatever the merits or demerits of source code production may be in theory, Fintiv rightly does not contend that it was denied access to source code in a way that impeded its ability to develop its case.

## III.  The District Court Correctly Concluded That Fintiv Offered No Evidence That The Accused Products Meet The "Widget" Limitations.

After dispensing with Fintiv's attempts to recast the relevant question, what is left is the core of this case: Fintiv's failure to identify any "widget" software in Apple's accused products.

The district court correctly recognized that Fintiv and its expert, Dr. Shamos, failed to create a genuine dispute of fact on this issue. *Infra* Part III.A.  Dr. Shamos pointed to screenshots showing a user's interaction with Apple Pay but failed to explain how those screenshots constitute evidence of "widget" software.  *See* Appx8-9.  And while his report offered a laundry list of source code files in connection with the widget limitations, he denied in deposition that any of those files was the widget itself or part of the widget, and he offered no explanation as to what other piece of software they act on that might constitute a widget.  *See* Appx6-8.

On appeal, Fintiv insists that the district court overlooked or misconstrued aspects of its expert's testimony and failed to give Fintiv the inferences to which it was entitled as the non-moving party.  But the aspects of Fintiv's showing that Fintiv claims the district court overlooked—including Dr. Shamos's "product testing," *infra* Part III.B.1; his testimony regarding various source code modules, *infra* Part III.B.2, and Fintiv's attorney argument regarding Home Screen widgets, *infra* Part III.B.3—do not change the calculus.  And, despite Fintiv's framing, there is no "battle of the experts" when the district

court credits everything an expert says but still finds no evidence of a claim limitation in the accused product. *Infra* Part III.B.4. The district court correctly granted summary judgment of non-infringement.

## A. Fintiv offered no direct or circumstantial evidence of the claimed "widget."

Fintiv's opening brief repeats and repackages the same evidence the district court reviewed: (1) the paragraphs from Dr. Shamos's report, starting with paragraph 309, in which he paired conclusory assertions about a widget with unexplained string cites of source-code files, *see* OB37; *see also* OB17 (citing Appx18767; Appx18855-18856; Appx18860; Appx18905); (2) Dr. Shamos's deposition testimony discussing these source-code files and one other file,

File name

██████████████████████, that was not mentioned in his report, *see* OB37 (citing Appx18963-18968); *see also* Appx15233-15246; (3) the paragraphs from Dr. Shamos's report, starting with paragraph 359, in which he reproduced screenshots of the accused products and asserted, without explanation, that the products contain a widget, *see* OB37-39 (citing Appx18790-18791; Appx18882-18884; Appx18885-18886; Appx18927-18928; Appx19085-19087; Appx19201-19203); and (4) Dr. Shamos's testimony discussing his reliance on these screenshots,

*see* OB37, OB40-41 (citing Appx15247; Appx18961; Appx18963-18966; Appx18970; Appx27375).

As the district court recognized, none of this evidence creates a genuine dispute of material fact about the existence of a "widget" in the accused products. "To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court." *Intell. Sci.*, 589 F.3d at 1183; *see also Arthur A. Collins*, 216 F.3d at 1046 (non-movant must "designate specific facts showing that there was a genuine issue for trial"). Neither Fintiv nor its expert, Dr. Shamos, provided the "factual foundation" that would allow Fintiv to argue to a jury that Apple's products meet the "widget" limitations of the '125 patent.

To start, the district court correctly relied on Dr. Shamos's own admissions that none of the source code files cited in his report (nor the additional code mentioned for the first time in his deposition) is itself the claimed widget. *See* Appx6; Appx9-10. Fintiv concedes that this is true. OB44, 47. Apple asked Dr. Shamos about each of the source code

files mentioned in his report, and he agreed that none of them is the

claimed widget. Appx15235 (); Appx15239-

15241 ( and ); Appx15241 ( );

Appx15241-15242 ( ); Appx15243

( , , and );

Appx15233 (source code cited in paragraph 309 not the widget). He also

broadly acknowledged that "there is nowhere in [his] report that cites

the source code that makes up the widget," Appx15246, nor "a list of the

source code components that make up the widget," Appx15245.

Fintiv attempts to backfill by suggesting that the source code files

identified by Dr. Shamos could be *part of* the claimed widget. OB49.

But Dr. Shamos offered no such testimony. When asked, for example,

"Is it fair to say you don't know whether           is part of the widget or

not?," Dr. Shamos responded, "I don't know." Appx18967; *see also*

Appx18968 (same answer for "       "). And he took no position on

whether "                              " (a file he noticed for

the first time during his deposition) was part of the widget. Appx18967-

18968 (referring to file as "                        "). While Dr.

Shamos testified as a general matter that "software can consist of many

CONFIDENTIAL MATERIAL OMITTED

components," he acknowledged that he had not identified the "components that make up the widget" software and "d[id]n't know" whether any of the source code he identified was a "component of the widget." Appx15244-15245; *see* Appx18964-18966. Thus the district court's decision was not, as Fintiv suggests, based on an erroneous belief "that the widget software code must be represented in a single source code file." OB47-49. Rather, the district court was recognizing Dr. Shamos's failure to identify *any* software as the claimed widget or any part of that widget.

Fintiv insists that it offered circumstantial evidence that the widget limitations are satisfied because Dr. Shamos's opinions state that various source code files "act[] on widgets," even if those files are not widgets themselves. OB44. As explained above in Part I, however, the claims require (and Fintiv had to show evidence of) software that *is* the widget. Dr. Shamos never explained what any of the various source code files do, what they are acting on, or why a skilled artisan would understand that the thing they act on is software that qualifies as a "widget." For instance, Dr. Shamos asserted that ███ is "essential to getting the widget on the machine," *see* OB43 (quoting Appx18967),

File name

CONFIDENTIAL MATERIAL OMITTED

but did not explain what ▮▮▮ **[File name]** does or what software it supposedly

"get[s] … on the machine" that qualifies as a widget.  Appx18967.

Similarly, he testified that "▮▮▮ **[File name]**" is "involved in the creation of the

widget," but did not explain what ▮▮▮ **[File name]** does or what widget software

it "creates."  Appx18968; *see also* Appx18905 (asserting that "▮▮▮ **[File name]** is

configured to provision a widget" without saying how it does so or what

it provisions).

Simply invoking the label of "circumstantial evidence," as Fintiv

does (OB43), is not a license to accept Dr. Shamos's unexplained

testimony or to make unsupported logical leaps.  *See, e.g., E-Pass*

*Techs., Inc. v. 3Com Corp.,* 473 F.3d 1213, 1221-23 (Fed. Cir.

2007) (rejecting supposed "circumstantial" evidence as "too speculative

a leap").  Nor is it a license to accept Fintiv's attorney argument about a

slide describing Apple Pay provisioning.  OB45-46 (citing Appx19317-

19318).  As the district court noted, this is "an undated, one-page

presentation" that was not addressed by Fintiv's expert and "says

nothing about" widget software.  Appx11 n.2; *see* Appx21606 n.3.

Indeed, contrary to Fintiv's attorney speculation, the presentation

suggests a provisioning request that returns user interface "data," not

executable code.  Appx19318.  The "technical documents" Fintiv cites (but does not discuss) similarly say nothing about widget software and were never explained by Fintiv's expert.  *See* OB20-21 (citing Appx19085-19090; Appx19105-19112; Appx19116-19120; Appx19322; Appx19326; Appx19329-19330).

Fintiv's cited authority demonstrates a proper use of circumstantial evidence.  In *Liquid Dynamics Corp. v. Vaughan Co.* (cited at OB43), direct structural evidence showed that 36 of the 47 accused slurry tank systems infringed the asserted claims.  449 F.3d 1209, 1217 (Fed. Cir. 2006).  But the defendant had incomplete records for the remaining 11 tank installations.  The plaintiff instead relied on circumstantial evidence in the form of (1) the engineering manual for all accused installations and (2) an admission by the defendant's Chief Engineer and technical expert that, "even where there is missing information, one could generally reconstruct a tank using the specification" in that manual.  *Id.* at 1219.  This Court held that a jury could reasonably rely on such circumstantial evidence to find that the 11 installations with incomplete records infringed.  *See id.* at 1220.

Fintiv has nothing like that evidence here. All it has is Dr. Shamos's repeated insistence that various source code files or other technical documents are evidence that a widget must exist in Apple's accused devices, with no explanation of why that would be so. As this Court's case law shows, that is not enough. In *Intellectual Science Technology*, for instance, this Court affirmed summary judgment of non-infringement when the plaintiff's expert simply asserted a limitation was satisfied and then cited to product schematics containing an "unexplained array of electronic symbols." 589 F.3d at 1184-87. Because the expert did not "pinpoint where [claimed] elements are found in the accused devices," and did not "specifically identify the infringing features … and the reason that one of skill in the art would recognize them as infringing," there was no genuine dispute of material fact. *Id.* at 1184-85; *see also Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016) (patentee's expert declaration insufficient to raise fact issue for infringement where it was "ambiguous at best" regarding how accused product satisfied limitation). The same is true here.

The district court also properly disposed of Fintiv's supposed direct evidence—Dr. Shamos's reliance on screenshots of Apple's accused devices and his testimony about those screenshots.  *See* OB37-42.  As the district court recognized, "neither Dr. Shamos nor Fintiv can identify specifically what in these screenshots is the claimed 'widget.'"  Appx8-9.

Fintiv insists that the "screenshots … show the user interfaces of the accused widgets in the form of credit cards."  OB38.  But Dr. Shamos failed to provide any basis for his insinuation that the card art is the "user interface[]" of some unidentified widget software.  *Infra* 63-68.  And his testimony confirmed that the card images are not themselves the widgets.  He acknowledged that the card art in Apple's devices "is either a PDF or a PNG file."  Appx18961.  And while he opined that these types of files "*can* have executable code in them," Appx18961 (emphasis added), he also admitted that he "d[id]n't know" if the card art files on the accused devices contain executable code and "didn't find that out as part of [his] work in this case," Appx18969; *compare* Appx14060-14062 (Apple expert and engineering witness confirming that PDF and PNG files in accused devices do not contain

code or have any code associated with them).  As the district court

explained, Dr. Shamos's "speculation is not a substitute for evidence."

Appx8.

## B.    Fintiv's criticisms of the district court's decision are unavailing.

On appeal, Fintiv complains that the district court misconstrued

its expert's testimony and failed to give Fintiv the inferences to which it

was entitled as the non-moving party.  But Fintiv fails to identify any

evidence that the district court misunderstood or overlooked.  And

drawing *reasonable* inferences in Fintiv's favor did not require the

district court to make unsupported logical leaps or imagine

infringement theories on Fintiv's behalf.  *See Wis. Alumni Rsch. Found.

v. Apple Inc.*, 905 F.3d 1341, 1352-53 (Fed. Cir. 2018) (holding that,

when "inference [non-moving party] would have a fact-finder draw … is

not reasonable," summary judgment is required).

### 1.    Pointing to product functionality and assuming it involves a "widget" is speculation, not evidence.

Fintiv first argues that it was entitled to show infringement based

on so-called "product testing"—which is how Fintiv characterizes Dr.

Shamos's reproduction of screenshots from the accused devices, paired

with assertions that those screenshots show a widget.  OB19; OB36-42.  Fintiv insists that "an expert may prove infringement by demonstrating the functionality of a piece of software through its operation."  OB36.

But the dispute here is not about the functionality of a piece of software in the accused devices—it is about whether there is any such software in the first place.  Dr. Shamos's testimony simply assumed that some underlying software is responsible for the functions he observed in the accused products, and that the software—whatever it is—must qualify as a widget.  But Dr. Shamos provided no evidentiary basis for that assumption.  He did not explain why the functions he observed were evidence that "widget" software—versus, for example, mere data, or software that does not otherwise meet the "widget" claim limitations—is behind those functions.  Indeed, when pressed to explain what software underlay any observed functionality—for instance, the operating system's "screen manager" that supposedly allows interaction with the card art, OB40—he immediately backtracked and confirmed that this underlying software is "not in the widget."  *See* Appx18963-18964.

In essence, Dr. Shamos's approach is like pointing to a picture of a Tesla and asserting that it satisfies patent claims that require "a vehicle comprising an internal combustion engine."  The fact that the accused product looks like the claimed device or performs the same overall function does not show that, when you look under the hood, the product has the components the claims require.  Here, showing infringement requires looking under the metaphorical hood and seeing whether there is, in fact, any "code that's sitting behind" the card art image.  OB41 (quoting Appx15247).  Dr. Shamos could not identify any such code because Apple's products do not use widget software in the way the '125 patent requires—just like a Tesla doesn't use a combustion engine to create the mechanical energy that drives the vehicle.

This Court addressed a similar dynamic in *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816 (Fed. Cir. 2016).  There, the district court had construed the claimed "handheld device" to be a "direct pointing device," meaning that the position of an on-screen cursor is based directly on the system's determination of the screen location where the input device is pointing.  *Id.* at 823.  UltimatePointer attempted to show infringement based on documentation and expert

product testing showing that Wii users can point at a screen to control a cursor. *Id.* at 825. But all of this evidence "simply illustrate[d] how the Wii remote is used, not how it works." *Id.* And the accused product worked differently than the claimed device—namely, the Wii's cursor position was determined by an interaction between the handheld device and a separate sensor bar, not the screen. *Id.* This Court affirmed summary judgment of non-infringement based on UltimatePointer's failure to "generate a genuine dispute of material fact." *Id.*

Fintiv, like the patentee in *UltimatePointer*, is trying to use evidence of product functionality—in other words, user experience—to satisfy claims that require the device to employ a particular technical configuration. *See, e.g.*, OB40 (Dr. Shamos "reiterated where the widget was in the accused product as shown by the functionality…"); OB42 ("Fintiv is entitled to an inference that the functionality demonstrated by Dr. Shamos" is a widget); OB54 ("passes would exhibit the same functionality as a widget"). But, as the district court explained, all of Fintiv's proffered testimony about product screenshots amounts to "mere speculation" about whether "widget" software is actually behind the screen. Appx9. This is no mere "location dispute[]," as Fintiv

66

suggests.  OB55-56 (citing Appx15247-15248).  It is a failure to identify

software *anywhere*—whether "within" or "behind" the card image,

OB56—that might satisfy the "widget" limitations.

The cases on which Fintiv relies are not to the contrary.  *See*

OB35-36.  In *Versata*, for example, the claims required "computer

instructions" for performing a set of functional operations, such as

accessing customer and product hierarchies to determine a price.  717

F.3d at 1259.  The expert demonstrated those specific claimed functions

by executing the accused product's source code, not assuming that

computer instructions existed or making inferences based on unclaimed

functionality.  *Id.* at 1261-62; *see also Amdocs*, 761 F.3d at 1342-43

(dispute was over which software had to perform claimed functions—

source code on installation CD or separate "DSD scripts"—not whether

software existed).  And in *Metropolitan Life Insurance Co. v. Bancorp

Services, L.L.C.,* this Court held that the patentee could show

infringement of claims requiring policy administration using "SVPIC"

calculations by pointing to spreadsheets that contained those

calculations.  527 F.3d 1330, 1338-39 (Fed. Cir. 2008).  The accused

infringer admitted that the spreadsheets did SVPIC calculations; the

dispute was whether those specific spreadsheets had ever been used for policy administration.  *Id.*  None of these cases suggests that parties can prove infringement by pointing to product screenshots and speculating about what is behind the screen.

> **2.    Fintiv's evidence does not create any reasonable inference of a widget.**

Fintiv repeatedly insists that the district court misinterpreted Dr. Shamos's testimony regarding certain source code and failed to give Fintiv the inferences to which it was entitled.  *E.g.*, OB48-49; OB52-54; OB56-59.  But Fintiv's arguments fail to identify any error in the district court's analysis.

As an initial matter, there is no basis for Fintiv's complaint that the district court wrongly discarded Dr. Shamos's opinions because he cited no testimony from an expert who had "'personally reviewed' the Apple source code."  OB50 (quoting Appx7).  Fintiv misrepresents the quoted language, in which the district court was distinguishing the facts of a case Fintiv had relied on (but does not cite on appeal) to argue that it had no obligation to identify infringing software.  *See* Appx7.  The real problem the district court identified is encapsulated in another quote distinguishing Fintiv's "misleading" citation to another inapposite

CONFIDENTIAL MATERIAL OMITTED

case: "Here, Dr. Shamos had Apple's source code, but still found no 'widget.'" Appx7 n.1.

Fintiv nonetheless insists that Apple's source code files, despite not being all or part of the widget, indicate the presence of a widget somewhere in the product. Fintiv first cites Dr. Shamos's testimony about the "███████" and "███████" files, arguing that these files "confirm[] that a widget was present." OB49; *see also* OB52-54 (arguing that district court improperly made inferences regarding "pass" files in Apple's favor). But, as explained above (at 58-59), testimony that "pass" files are not "all of the widget," OB48, is not evidence that there is, in fact, a widget somewhere in the accused device. That is especially so given Dr. Shamos's admission that he "do[esn't] know" whether the pass files are even "part of" the widget. Appx18967-18968.

Fintiv's attorneys attempt to draw some generalized connection between passes and widgets by pointing to testimony from an Apple witness who, when asked what a "pass" is, responded that it is a "UI and software presentation on the application processor that relates to the card that was installed," and that "card art … could be considered as part of the pass." Appx19378-19380; *see* OB54. But nothing in this

testimony connects the "pass" to a "widget" or explains what role the

" ████████ " and " █████ " files play. Nor did Dr. Shamos address this

supposed evidence or explain why it would suggest the presence of a

widget.

Fintiv also notes that "passes appear to be terms from Apple's

Passbook application that was rebranded as Apple's Wallet," OB54, but

it is unclear why this speculation has any bearing on whether Fintiv

has identified a piece of software that constitutes a "widget" within the

accused products.

Fintiv also asks the Court to infer that there is a widget in the

accused products based on the existence of a source code file containing

the term " ████████ ." OB54-55, 59 (discussing

" ██████████████████████████ "). That file is not included in

Dr. Shamos's report. Instead, as noted above (at 57), Dr. Shamos first

"found" this file midway through his deposition, "[o]n the way to looking

… up" the answer to a question he had been asked about the █████ file.

Appx18968. For that reason alone, it cannot create a genuine dispute of

fact. *See supra* 20 (district court holds experts to their reports).

Regardless, all Dr. Shamos said about this file is that it "appears to be

related to viewing the widgets." Appx18968; *see* Appx27276-27277; Appx26302; Appx26289. He did not say it was the widget (or part of the widget), Appx8, nor did he provide any basis for connecting it to the "widget" software required by the claims. It therefore would not be reasonable, as Fintiv suggests, to infer from this file's name alone "that widgets do exist in Apple Pay." OB54-55.

Fintiv also criticizes the district court for relying on testimony

File name

from an Apple engineer that ███████████████████████ "has no purpose and is not used on the Mac." OB55 (quoting Appx8); *see* Appx19365-19366. According to Fintiv, this testimony suggests by omission that the file *is* used in iOS. OB55. But the file was observed in the Mac source code, not iOS source code. Appx18614. And Fintiv's attorney argument mischaracterizes Apple's witness testimony. The

File name

engineer did not say that ███████████████████ is "*a framework in the Wallet project* that's used exclusively on iOS devices.*" OB55 (quoting Appx19365-19366, emphasis Fintiv's). He said that the

File name

"███████," which is referenced in the file, is such a framework. Appx19366. Fintiv's misrepresentation illustrates the ultimate point: this file cannot create a genuine dispute of fact regarding the widget

limitations because there is no record evidence connecting the file to anything that might constitute a "widget." *Compare Versata*, 717 F.3d at 1261 (cited at OB55) (expert testified about notes left by programmers in source code).

> **3. Apple's use of the word "widget" in connection with unrelated, unaccused parts of its products is irrelevant to infringement.**

Fintiv also asks the Court to infer that a widget is in the accused features of the products because Apple has used the term "widget" to describe other, unaccused features in its products. Specifically, Apple's mobile iOS operating system has Home Screen widgets that allow users to do things like display the weather, view calendar events, or track notes. OB56-59.

But the district court recognized—and Fintiv does not dispute— that Home Screen widgets "ha[ve] nothing to do with Apple Pay or Apple Wallet." Appx11; *see* OB58. Indeed, Dr. Shamos did not even mention Home Screen widgets in his report, much less analyze how they function or explain why they have some bearing on infringement. *See* Appx11. Rather, Fintiv raised Home Screen widgets for the first

time in its summary judgment opposition, relying only on attorney argument. *See* Appx21605-21606.

Fintiv's reasoning for why the district court nonetheless should have relied on that argument to infer that widget software must exist in Apple Pay or Wallet is unpersuasive. Fintiv first asserts (without citation) that "Apple clearly admits [Home Screen widgets are] a 'widget.'" OB58. But, of course, Fintiv does not and cannot claim that Apple admitted that Home Screen widgets are a "widget" within the meaning of the '125 patent claims. As the district court put it, Apple's Home Screen widgets may have used the generic term "widget" in the same way one might refer to "Acme" when talking about a corporation, but there is no evidence suggesting that Apple believed Home Screen widgets are "a widget that would qualify under the Court's construction." Appx27285-27287. And Fintiv's counsel admitted that Dr. Shamos "ha[d] not done that" analysis. Appx27287.

Fintiv tries to solve that problem by claiming that the court's construction of "widget" is just the plain and ordinary meaning of the term to software engineers. OB58-59. But the evidence it cites in support is Fintiv's own claim construction proposal—which asserted

73

that the plain meaning of "widget" is "functionality," not software, and which the district court rejected.  Appx63-67; *see supra* 17-18.

Furthermore, even if Home Screen widgets *did* qualify as "widgets" under the district court's claim construction, that would not help Fintiv.  Fintiv asserts that Home Screen widgets "are similar in functionality and appearance" to the functionality in Apple Wallet that Dr. Shamos equates with a widget.  OB59.  But Fintiv does not elaborate on what the supposed similarity is—and the record contains no evidence on the point.  Similarly, Fintiv insinuates that the Court should draw a connection between Home Screen widgets and Apple's supposed use of "the term 'Widget' in its Wallet naming conventions"— in other words, the ███████████████████████████ file.  OB59.

File name

But Fintiv offered no expert testimony connecting Home Screen widgets to either ███████████████████████ or the claims.  Dr.

File name

Shamos did not address Home Screen widgets at all.  Fintiv is relying on nothing but "[a]ttorney argument," which "is no substitute for evidence" and is insufficient to withstand a motion for summary judgment.  *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005).

Fintiv's cited caselaw again cannot help it. In neither case did this Court endorse the kind of logical leaps that Fintiv advocates. In *Versata*, the Court approved of an expert's use of the prior art to *contrast* the infringing system—not to "establish infringement," as Fintiv suggests. OB59; *see* 717 F.3d at 1263 (expert also testified directly to accused software's infringement). And here, unlike in *Liquid Dynamics*, Fintiv is not trying to compare multiple instances of a concededly similar thing. 449 F.3d at 1219; *see supra* 60-61. It is suggesting that, because Apple has *something* called a "widget" *somewhere* in its products, the district court had to infer that the accused features of those products contain widget software that satisfies all the claim limitations. To return to the Tesla analogy, Fintiv is essentially asking for an inference that, because a vehicle has a wiper fluid "tank," it must also have a fuel "tank." Fintiv has shown no basis for the unreasonable inference it demands.

### 4.    This is not a "battle of the experts."

Fintiv's last gambit is to frame this case as a "battle of the experts" with disputed facts and credibility issues that should have gone to a jury. OB42; OB51. But the only battle Dr. Shamos was

fighting was against the language of Fintiv's asserted claims.  He

needed to offer evidence that the accused products contain "widget"

software that satisfies the asserted claims and the court's construction.

He did not.

Once again, Fintiv relies on cases that bear no resemblance to this

dispute.  In *Metropolitan Life* (cited at OB51), competing declarations

submitted at the summary judgment stage presented "a direct

conflict … as to a material fact" about how the accused products

operated; the district court resolved the conflict by crediting one side's

declaration over the other.  527 F.3d at 1338-39.  "Resolving such

credibility disputes," this Court held, "is not appropriate on summary

judgment."  *Id.* at 1339; *see also Edwards Sys. Tech., Inc. v. Digital

Control Sys., Inc.*, 99 F. App'x 911, 921 (Fed. Cir. 2004) (affirming

denial of summary judgment when experts had each performed

experimental testing of accused products and had reached different

results) (cited at OB42); *compare MeadWestVaco Corp. v. Rexam Beauty

& Closures, Inc.*, 731 F.3d 1258, 1267-69 (Fed. Cir. 2013) (upholding

district court's decision to treat one expert as credible and one as not

credible during a bench trial) (cited at OB42).

76

The district court here, in contrast, said nothing about Dr. Shamos's credibility.  Nor did it weigh Dr. Shamos's opinions against evidence presented by Apple or its expert.  The problem for Fintiv was that, even after years of discovery, and even crediting everything Dr. Shamos said, there was no evidence that a "widget" exists in the accused products.  That is not a "battle of the experts."  It is one expert going on a "widget" hunt and coming back empty-handed.  And it is a perfectly valid reason for the district court to grant summary judgment. *See Intell. Sci. & Tech.*, 589 F.3d at 1183-87.

## CONCLUSION

The Court should affirm the district court's grant of summary judgment of non-infringement.

Respectfully submitted,

*/s/ Melanie L. Bostwick*

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121

Jessica Hannah
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105

Melanie L. Bostwick
Abigail Colella
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

*Counsel for Appellee*

January 25, 2024

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief contains 8 unique words or numbers marked as confidential, not previously marked in this case's briefing.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Appellee*